IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES HORNBERGER, JR., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 3:10-cv-1053 |
| | )    Judge Trauger |
| | ) |
| STATE OF TENNESSEE, | ) |
| *et al.*, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

**MEMORANDUM**

Pending before the court is a Motion to Dismiss Plaintiff's ADEA Claims (Docket No. 8) filed by the defendants State of Tennessee ("Tennessee"), Tennessee Department of Human Services ("DHS"), and Tennessee Department of Human Services: Disability Determination Services ("DDS"). The plaintiff has submitted a response in opposition (Docket No. 10), and the defendants have filed a reply in support (Docket No. 13). For the reasons discussed herein, the defendants' motion will be granted.

**BACKGROUND**

Plaintiff James Hornberger, Jr. is a resident of Davidson County, Tennessee.[1] The plaintiff is a retired former employee of defendant DHS, which is an executive agency of defendant Tennessee. For the final 22 years of his tenure with DHS, he worked with DDS, most

---

[1] Unless otherwise noted, the facts are drawn from the Complaint (Docket No. 1).

1

recently as a disability claims examiner. On August 31, 2009, he retired from DHS after nearly 30 years of service, at the age of 54.

The plaintiff alleges that he was effectively forced to retire. He claims that, in January 2006, DDS switched to a new computerized document manager system, the simultaneous development and implementation of which impaired DDS employees from keeping up with their caseloads. In or around August 2006, the plaintiff began working under a new supervisor, who began warning him that he was not keeping up with his caseload and commenting that he was "slow" and "always needing help from others." (Docket No. 1 at 3.) The plaintiff was orally warned that was he not keeping up with his caseload in May 2007, made to undergo an internal review in June 2007, and given a written warning regarding his caseload in July 2007. The plaintiff alleges that, during this period, his performance was at least on par with examiners in his department and that his review indicated that his work "quality was good and on-target for the department." (*Id.*) In December 2007, the plaintiff was approved for leave under the Family and Medical Leave Act of 1993 ("FMLA") to care for his ailing father. He took off one day per week for six weeks, but he was forced to stop using FMLA leave because his caseload "increased dramatically." (*Id.* at 4.) Shortly after his return to full-time work, he was suspended for poor caseload management and for having unpaid travel vouchers. The latter, to the plaintiff's knowledge, had never previously been cited as a basis for suspension.

The plaintiff alleges that, by October 2008, DDS had decided to terminate him. In July 2009, the Regional Director asked the plaintiff to sign a "Do Not Hire" notice, which the plaintiff alleges would preclude him from being employed in any department within the State of

Tennessee. The plaintiff refused to sign. At this point, the plaintiff considered his job to be "truly in jeopardy." (*Id.*) On August 31, 2009, he chose to retire to preserve retirement benefits that would be lost if he were terminated. The plaintiff alleges that this constituted a constructive discharge. The plaintiff believes that, shortly after his departure from DDS, his position was filled by a person under 40 years of age.

The plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination.[2] EEOC issued the plaintiff a Right to Sue letter on August 10, 2010. (Docket No. 1, Ex. 1.) On November 8, 2010, the plaintiff filed the Complaint in this action.

The plaintiff asserts two claims: (1) that the defendants discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and (2) that he was suspended in retaliation for taking FMLA leave. The defendants have jointly moved to dismiss the plaintiff's ADEA claim, pursuant to Federal Rule of Civil Procedure 12(b)(1). (Docket No. 8.) The defendants argue that they are immune from suit with respect to that claim under the Eleventh Amendment and related principles of sovereign immunity. (*Id.*; *see* Docket No. 15 (clarifying that the motion was filed on behalf of all defendants).)

---

[2] The plaintiff also filed a complaint with the Tennessee Human Rights Commission ("THRC") in April of 2008. (*See* Docket No. 11, Ex. 5 at 1.) The notice sent to DHS indicated that the complaint was filed under the "Tennessee Human Rights Act and/or the Tennessee Handicap Act alleging employment discrimination based on one or more of the following: race, creed, color, sex, age, religion, national origin or disability." (*Id.*) The THRC issued a Notice of Determination dismissing the complaint on August 27, 2009. (*Id.* at 2.)

**ANALYSIS**

**I. Standard of Review**

Federal Rule of Civil Procedure 12(b)(1) governs dismissal of lawsuits for lack of subject matter jurisdiction. "Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A state's assertion of sovereign immunity constitutes a factual attack. *See Dunn v. Spivey*, No. 2:09-0007, 2009 WL 1322600, at *3 (M.D. Tenn. May 11, 2009). When "considering a factual attack upon the court's jurisdiction, no presumption of truth applies to the plaintiff's factual allegations, and the court is free to weigh the evidence and resolve factual disputes so as to satisfy itself as to the existence of its power to hear the case." *Id.* (internal citation and quotation marks omitted). "In its review, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Gentek*, 491 F.3d at 330. "The entity asserting [sovereign] immunity has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Gragg v. Ky. Cabinet for Workplace Dev.*, 289 F.3d 958, 963 (6th Cir. 2003).

**II. Sovereign Immunity**

The defendants argue that they are immune from the plaintiff's ADEA claim. (*See* Docket No. 13 at 1-2.) Each of the states possesses certain immunities from suit that "flow from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc). Consequently, a state may not be sued in federal court by a private individual unless it consents to suit or unless its sovereign immunity has been

4

validly abrogated by Congress. *Id.* at 358-59. The Supreme Court has made clear that "arm[s] of the state" enjoy this same immunity but that "political subdivisions" do not. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). For the reasons discussed below, the court finds the DHS is an "arm of the state" that receives immunity and that DDS is not legally distinct from DHS for the purposes of suit in federal court.

### A. Whether the defendants are either the state or "arms of the state"

The plaintiff does not appear to dispute that the State of Tennessee, a named defendant in this suit, has sovereign immunity and that it may only be subject to suit in federal court if it has consented to suit or if its immunity has been validly abrogated.[3] *See Ernst*, 427 F.3d at 359. However, the plaintiff argues that defendants DHS and DDS have failed to meet their burden to demonstrate their entitlement to sovereign immunity under *Gragg*, 289 F.3d at 693. (Docket No. 11 at 6.) The Sixth Circuit, sitting *en banc*, has identified a four-factor test to determine whether an entity is an "arm of the state" for purposes of sovereign immunity:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local goverment.

*Ernst*, 427 F.3d at 359 (internal citations and quotation marks omitted). The first factor is "*generally* the most important factor . . . but not the sole criterion for determining whether an

---

[3] It is somewhat unclear from the plaintiff's argument whether he considers the state of Tennessee to truly be a defendant in the suit. (*See* Docket No. 11 at 5-6) (suggesting that the defendants' motion misses the point by asserting that " 'a state may not be sued' . . . . because it fails to address the controlling issue at bar as to whether or not the *Defendants* are agents of the state") (emphasis added).)

agency is a state entity for sovereign immunity purposes." *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 761 (6th Cir. 2010) (internal citation and quotation marks omitted). The court will analyze separately whether DHS and DDS may be sued for a violation of the ADEA consistent with state sovereign immunity.

### 1. DHS is an "arm of the state" of Tennessee

As an initial matter, the court notes that other courts have consistently concluded that DHS is an "arm of the state" without explicitly applying the substance of the four-factor test. *See, e.g.*, *Giorgio v. Tenn. Dep't of Human Servs.*, No. 95-6327, 1996 WL 447656, at *1 (6th Cir. Aug. 7, 1996); *Bowen v. Tennessee*, No. 03-2883-D/P, 2004 U.S. Dist. LEXIS 30509, at *5 (W.D. Tenn. Feb. 4, 2004) (concluding that DHS and DDS were immune from suit because of Tennessee's sovereign immunity); *Moss v. Tenn. Dep't of Human Servs.*, Civil No. 2:07-0012, 2008 WL 4552421, at *10 (M.D. Tenn. Oct. 7, 2008) (accepting the magistrate's report, which concluded that DHS's sovereign immunity was one of several legal grounds that required dismissal of the complaint).

With respect to DHS, the plaintiff's sole "arm of the state" argument appears to be a request that DHS's claim of sovereign immunity be analyzed using the Sixth Circuit's four-factor test. (*See* Docket No. 11 at 5-6 (suggesting that DHS's argument in the defendants' motion amounts to "asking the court to 'just believe' we . . . are agents of the state" without the plaintiff making any particularized argument for any factor).) Consistent with its "broad discretion" in making factual determinations to resolve factual attacks made in Rule 12(b)(1) motions, *Gentek*, 491 F.3d at 330, and after reviewing relevant sections of the Tennessee Code,

6

the affidavit of DHS's Assistant Commissioner (Docket No. 14), and other documents filed with the court, the court finds that DHS is, in fact, an "arm of the state" for purposes of sovereign immunity under the *Ernst* factors.

The first factor supports a finding of immunity because it appears that Tennessee would be liable for any judgment against DHS. *See Ernst*, 427 F.3d at 359-60. The State of Tennessee has represented to the court that it is the "real party in interest," that "[a]ny judgment entered against [DHS] would ultimately be paid by the State of Tennessee," and that DDS is not legally distinct from DHS. (Docket No. 15 at 1.) The plaintiff has made no argument to the contrary.[4]

The second factor supports a finding of immunity because the operation of DHS is controlled by the state. *See Ernst*, 427 F.3d at 360. DHS was created by the state legislature, *see Giorgio*, 1996 WL 447656, *1 (citing Tenn. Code Ann. § 4-3-1201), and DHS is identified by the Tennessee Code, the courts of the State of Tennessee, and Tennessee's executive branch as an executive administrative agency of the state of Tennessee, *see* Tenn. Code Ann. § 4-3-101 (recognizing DHS as one of the state's twenty-four executive administrative agencies); *Gallaher v. Elam*, 104 S.W.3d 455, 464-65 (Tenn. 2003) (same); (Docket No. 15 (representation by current Tennessee Attorney General that DHS is "an arm of the state").) Under Tennessee law,

---

[4]Although the State receives federal funds reimbursing it for its administration of certain Social Security Act programs by DHS, this is irrelevant with respect to this factor. *See Ernst*, 427 F.3d at 359 (citing *Regents of Univ. of Cal. v. Doe.*, 519 U.S. 425, 431 (1997) (holding that the Eleventh Amendment protected the state from "the risk of adverse judgments," even though the state was fully indemnified by the federal government for any damages that would arise from that judgment)).

DHS is ultimately under the control of the Governor. *See* § 4-3-1202 (explaining that DHS is "under the charge and general supervision of the commissioner of human services"); *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 768 n.52 (Tenn. Ct. App. 2001) (explaining that, except for four certain agencies under the control of "constitutional officers," all other agencies, including DHS, remain the governor's "ultimate resonsib[ility]"); (Docket No. 14 Ex. 2 at 2 (former Gov. Alexander indicating he has authority over DHS under both the Tennessee Code and the state constitution).) Additionally, the State controls the means by which DHS may receive funding, including the extent to which it may accept federal funds. *See, e.g.,* Tenn. Code Ann. §§ 4-4-116 ("Federal Grant Programs"), 9-1-116 ("Programs and Services Limited to the Extent Funds Available"). The plaintiff has not made any argument to the contrary with respect to any of these points. In fact, the plaintiff indicates that he receives retirement benefits from the State of Tennessee by virtue of his former employment at DHS. (Docket No. 1 at 4, 6.)

The third factor supports a finding of immunity because DHS's Commissioner and officers are appointed by state officials. *See Ernst*, 427 F.3d at 360-61; Tenn. Code Ann. §§ 4-3-112 (explaining that the Commissioner is gubernatorial appointee who serves at the pleasure of the Governor); 4-4-106 (noting that, generally, DHS "officers, assistants and employees as may be necessary to carry on the work of [the] department of the state government shall be appointed by the commissioner" of DHS).

Finally, the fourth factor, which examines whether the entity performs a state or local function, is the closest, but it ultimately supports a finding of immunity. *See Ernst*, 427 F.3d at

361. Essentially, the DHS is administering a "cooperative federalism" program in which states agree to provide benefits and services to their residents up to federal standards as a condition for receiving federal funds. *See generally Strickland v. Shalala*, 123 F.3d 863, 864 (6th Cir. 1997) (explaining the concept of "cooperative federalism" in the context of administration of Social Security Act programs). However, the Sixth Circuit has made clear that this function "cannot be characterized neatly as completely within the traditional purview of either local or state government." *Lowe v. Hamilton County Dep't of Job & Family Servs.*, 610 F.3d 321, 331-32 (6th Cir. 2010) (finding that this factor did not favor sovereign immunity where Ohio law required creation of county departments to administer its federal responsibilities).

In these circumstances, the Sixth Circuit has indicated that courts should look to the scope of the entity's jurisdiction, the source of the entity's authority, and whether the funding comes predominantly from local or state government. *See id.* (citing *Ernst*, 427 F.3d at 361). DHS is a single entity with statewide jurisdiction whose function is to "administer *all functions* to be established *in this state* under the federal Social Security Act," unless otherwise expressly delegated by state or federal law. Tenn. Code Ann. § 4-3-1203 (emphasis added); *see also Bowen*, 2004 U.S. Dist. LEXIS 30509, at *5 (concluding that DHS was entitled to state sovereign immunity as a "statewide agenc[y]"). There is no indication in the contract between the state and the federal government that local funds are used at all. (*See* Docket No. 14, Ex. 1).

Consequently, the court finds that this factor, as well as the other three factors, support a determination that DHS is an arm of the state. Thus, DHS cannot be sued unless its sovereign immunity is validly abrogated or waived.

9

### 2. DDS is not an entity distinct from DHS that can be sued in its own right

The plaintiff makes two arguments with respect to why DDS is not entitled to sovereign immunity: (1) the defendants have not provided evidence that DDS is an arm of the state in its own right (Docket No. 11 at 6); and (2) because DDS receives federal funding and administers a federal program, it is not an arm of the state (*id.* at 6-7). Because the court concludes that DDS is not an entity distinct from DHS, it will not address the plaintiff's second argument.

The parties disagree about whether DDS is an entity distinct from DHS, with the capacity to be sued in its own right. (*See* Docket No. 13 at 2.) This question is preliminary to the issue of whether DDS partakes in the state's sovereign immunity. *See Peirick v. IUPUI Athletics Dep't*, 510 F.3d 681, 694 (7th Cir. 2007) (dismissing the plaintiff's ADEA claim against the athletics department of the university before subjecting the claim against the university and its board to Eleventh Amendment analysis, because "the [a]thletics [d]epartment is not a legal entity apart from the [u]niversity . . . [that] is capable of being sued" in its own right).

Federal Rule of Civil Procedure 17 provides that the capacity of a non-individual to be sued is determined by state law. Fed. R. Civ. P. 17 (b)-(c); *see also Haines v. Metro. Gov't of Davidson County*, 32 F. Supp. 2d 991, 994-5 (M. D. Tenn. 1998). The affidavit of DHS's Assistant Commissioner (Docket No. 14.) and the accompanying executive order of former Gov. Alexander (Docket No. 14, Ex. 2) support the defendants' position that DDS is a mere subdivision of DHS. (*See* Docket No. 13 at 2.) The plaintiff has offered no support for a contrary proposition; rather, this is consonant with the plaintiff's characterization of the facts of this case, particularly that he worked for DDS while he was employed by DHS. (*See* Docket No.

11 at 1.) Consequently, the court concludes that DDS is a subdivision of DHS.

The "normal rule is that a government entity may choose the level at which it will pursue and defend all law suits against it." *Haines*, 32 F. Supp. 2d at 994-95. DDS is never specifically mentioned in the Tennessee Code; thus, if it has the capacity to be sued, that capacity could only have been conferred by the executive or recognized by the judiciary of Tennessee. But DHS appears to have been specifically precluded from imbuing its subcomponents with the authority to sue or be sued, because DHS only has those powers which have been expressly delegated to it, and not those expressly reserved to other departments. *See* Tenn. Code Ann. §§ 4-3-103, 4-3-1203 (generally limiting its authority to the administration of the state's Social Security Act functions); *cf.* § 4-3-1503 (identifying the Tennessee Attorney General's office as the state agency which may institute suits on behalf of the state and defend the various departments from civil suit).

There is no indication that Tennessee courts have ever recognized DDS's capacity to be sued in its own right.[5] Because the court finds that DDS is not an entity independent from DHS, there is no need to separately apply the *Ernst* factors to DDS.

### B. Whether Congress has validly abrogated the DHS's sovereign immunity

The plaintiff argues that the court should find that DDS's sovereign immunity has been "abrogated" with respect to all claims against DDS because DDS "administers the Social

---

[5] The court's own research did not reveal any Tennessee state-court opinions indicating that DDS has ever been sued in its own right. None were otherwise brought to the court's attention. As noted *supra*, the court did locate a suit in the U.S. District Court for the Western District of Tennessee against DDS and DHS, but that suit was dismissed against both on state sovereign immunity grounds. *Bowen*, 2004 U.S. Dist. LEXIS 30509, at *5.

11

Security Disability Program and [is] primarily federally funded." (Docket No. 10 at 1.) This argument is perhaps better understood as an argument for constructive consent to suit. *See generally Parden v. Terminal Ry. of Ala. Docks Dept.*, 377 U.S. 184, 192 (1964) (holding that, by "operating a railroad in interstate commerce [after the passage of Federal Employee Liability's Act,] Alabama must be taken . . . to have consented to suit"); *but see College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680 (1999) ("Whatever may remain of our decision in *Parden* is expressly overruled."). The court will treat this argument as if made against DHS, as it is not legally distinct from its subcomponent DDS.

Irrespective of how it is labeled, the plaintiff's argument must be rejected. The Supreme Court has held that "the ADEA does not validly abrogate the States' sovereign immunity." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73, 92 (2000). Moreover, even before it expressly overruled *Parden*, the Supreme Court rejected the proposition that a state constructively consents to suits relating to its administration of a federally funded program by virtue of "participating in the federal . . . program and agreeing to administer federal and state funds in compliance with federal law." *Edelman v. Jordan*, 415 U.S. 651, 653, 673 (1974) (upholding the dismissal of a class action suit for declaratory and injunctive relief against a state official for administration of a disability assistance program, funded in part by the Social Security Act, in a manner allegedly inconsistent with federal regulations and the Fourteenth Amendment).

**C. Whether the defendants have waived their sovereign immunity by conduct**

Finally, the plaintiff argues that the State of Tennessee has "consented to suit in federal court by issuing Plaintiff a Notice of Determination from the Tennessee Human Rights

Commission which permitted Plaintiff to file a private action under the ADEA in federal court."[6] (Docket No. 10 at 1.) The plaintiff admits that the "substantive nature" of the notice was to inform him of the outcome of its investigation, but he contends that the consent to suit is "clearly state[d] on it face." (Docket No. 11 at 8.)

After dismissing the plaintiff's complaint in bolded text, the letter reads:

If the Complainant wishes to pursue this matter further he can:

> 1. File a written request for reconsideration . . . .
>
> 2. File a private action in the state court system . . . ., or
>
> 3. File a private action in federal court. *If a federal law is involved*, this agency will send the Equal Employment Opportunity Commission (EEOC) a copy of this notice. The EEOC will then mail the parties a notice of this case and/or a right to sue in federal court. Such suit must be filed within 90 days of the receipt of the EEOC notice of closure or right to sue.

(Docket No. 11 at 8 (emphasis added).) The defendants argue that the letter "merely provided [the plaintiff] with his options . . . . It did not expressly waive the State of Tennessee's sovereign immunity from suit in federal court. (Docket No. 13 at 3.) The court agrees.

To waive sovereign immunity by "affirmative litigation conduct," a state must evince a clear intent to voluntarily submit its rights to judicial determination by a federal court. *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 617, 620 (2003) ("*College Savings Bank*

---

[6] The plaintiff has characterized the Commission as "the State of Tennessee." (Docket No. 11 at 8.) The defendants have focused their response solely on the lack of clear intent to waive. (*See* Docket No. 13 at 3.) The court expresses no opinion with respect to the capacity of the commission to waive sovereign immunity under state law or the propriety of considering it a litigant in this context.

distinguished the kind of constructive waivers repudiated there from waivers effected by litigation conduct."); *Ernst*, 427 F.3d at 358 ("A State may elect to waive that immunity through legislation, or through its conduct in litigation." (internal citations omitted)). While the touchstone remains the clear intent of the state to waive its sovereign immunity, the "relevant 'clarity'. . . must *focus on the litigation act* the state takes that creates the waiver." *Lapides*, 535 U.S. at 620 (emphasis added). The general principle is that, "where a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment." *Id*. at 619 (quoting *Gunter v. Atl. Coast Line R. Co.,* 200 U.S. 273, 284 (1906)). The rationale is the Eleventh Amendment's "presumed recognition of judicial need to avoid inconsistency, anomaly, and unfairness." *Id.* at 620. Consequently, even where a state is at first involuntarily before a court, the Eleventh Amendment is not a license to "achieve litigation advantages." *Id.* (holding that state could not assert sovereign immunity defense where the state had waived immunity in state court and agreed to remove suit to federal court); *Ku v. Tennessee*, 322 F.3d 431, 434 (6th Cir. 2003).

In this case, the wording of the letter does not clearly evince an intent to waive immunity with respect to ADEA claims against the state in federal court. A state may limit its waiver of sovereign immunity to *certain claims* and to particular courts. *See Lapides*, 535 U.S. at 617; *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 241 (1985). The paragraph relating to suit in federal court does not mention sovereign immunity, the putative defendant(s), or the claim(s) which might be brought. For example, the letter reads: "*If federal law is involved . . . .*" (Docket

No. 11 at 8 (emphasis added).) This sentence alone precludes finding the letter clearly waived with respect to the ADEA claim at issue. This paragraph seems to be nothing more than an abbreviated explanation about how the EEOC apparatus works. (*See id.*) Certainly there is nothing in this letter to suggest that the state, involuntarily before a federal court, has engaged in the "type of clear litigation conduct [that] creates the same kind of 'inconsistency and unfairness' the Supreme Court was concerned with in *Lapides*." *Ku*, 322 F.3d at 435 (concluding that it was abusive to allow a state that "engaged in extensive discovery and invited . . . judgment on the merits" to assert immunity as a defense only after the federal district court entered judgment against the state). Consequently, the defendants have not waived their immunity by litigation conduct.

## CONCLUSION

In sum, DDS is not an entity distinct from DHS for purposes of this suit, and both DHS and the State of Tennessee are entitled to sovereign immunity with respect to the plaintiff's ADEA claim. This immunity has neither been validly abrogated by Congress nor waived by the defendants. Consequently, the defendants' Motion to Dismiss the Plaintiff's ADEA Claims (Docket No. 9) will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge