UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES HORNBERGER, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:10-cv-1053 |
| v. ) | |
| ) | Judge Sharp |
| STATE OF TENNESSEE, *et al.* ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Defendants State of Tennessee ("Tennessee"), Tennessee Department of Human Services ("DHS"), and Tennessee Department of Human Services: Disability Determination Services ("DDS") (hereinafter referred to as "Defendant") filed a Motion for Summary Judgment (Docket Entry No. 40), to which Plaintiff James Hornberger, Jr. ("Plaintiff" or "Hornberger") filed a response in opposition (Docket Entry No. 49), and Defendant filed a reply (Docket Entry No. 53).

## I. FACTUAL BACKGROUND

Plaintiff was employed by the State of Tennessee Department of Human Services from 1977 until 2009.[1] The Federal Social Security Administration contracts with each State to administer social security claims. DDS is the division within the Tennessee DHS that handles social security disability claims on behalf of the federal government. Plaintiff worked for DDS. He worked with DDS from 1987 until he retired in 2009 and had worked with TDHS and other

---

[1] Unless otherwise noted, the facts are drawn from the *Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment*, *Plaintiff's Statement of Additional Material Facts* and the parties' responses thereto (Docket Entry Nos. 42, 50, 51 and 54 ) as well as declarations and other related exhibits. In any event, and based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

1

state agencies prior to that. Plaintiff was assigned to a social security unit in 2006. He stayed in this unit, Unit 57, as a claims examiner until his retirement.

A claims examiner is electronically assigned social security disability claims that have to be processed, and it is the examiner who reviews the claim. An examiner gathers the vocational and medical information needed to make a determination as to whether a claimant qualifies for disability. Claims examiners, including Plaintiff, received 3 new cases a day on average. There were no exemptions from receiving new cases on a daily basis with two exceptions: each examiner could request one week off from receiving cases once a year or if they were out of work for 30 days.

In January 2006, DDS employed a new Document Manager computerized system. (Docket Entry No. 52-10, Hornberger Aff., ¶4). The new system was being implemented and developed concurrently, which placed a great burden on employees of the Division to keep up with their caseloads. (*Id.*). Further, Plaintiff's supervisor, Virginia Talley, was transferred to another department within DDS in April 2006, which resulted in Plaintiff being without any direct supervision for approximately four months. (*Id.*).

In August 2006, Beal Howell, Regional Director for DDS promoted Debra Ward to the supervisor position over Plaintiff's work unit. (*Id.* at ¶5). From 2007-2009, Plaintiff's immediate supervisor in Unit 57 was Ward. There were approximately 7-8 people in his unit, although the number fluctuated at times. Howell supervised several units including 57. Howell, in turn, was supervised by Jeff Eddie, the Human Service Program Director.

DDS increased work performance standards in approximately 2006. Eddie adopted new guidelines to measure the performance of claims examiners. "Strategies of Success" was a tool used to evaluate the quantity of cases cleared by claims examiners. (Docket Entry No. 52-1,

Guidelines for Disciplinary Action Based on Performance memorandum). According to the new policy, an examiner with 15% more cases than the agency average for four consecutive weeks would have a "Strategies for Success" developed for them. (*Id.*). According to Plaintiff's deposition testimony, the "strategies for success" was not punitive, but instead, was a coaching opportunity. (Docket Entry No. 44-1, Hornberger Depo., p. 77). If the examiner had 20% more cases than the agency average for four consecutive weeks, the examiner would have an "action plan" developed for them. (*Id.*, p. 77-78). The action plan was another coaching opportunity and not a disciplinary action. (*Id.*). If no improvement was made for six weeks, an oral warning could be issued. This would lead to a written warning if no improvement was made for another six weeks after the oral warning. (*Id.*). Continued poor performance could then result in a suspension and eventually termination. (*Id.*, pp. 80-81). An examiner's case load balance was a primary way used to measure the examiner's performance under the new guidelines. (Docket Entry No. 44-2, Hornberger Depo., p. 198). Eddie implemented the system so that every examiner could be graded equally on the same standards. (Docket Entry No. 44-4, Eddie Depo., p. 82). According to Eddie, as a result, several employees who had gotten by before the new system were eventually terminated. (*Id.*, p. 83).

Shortly after her arrival, Ward began warning Plaintiff that he was not keeping up with his caseload. (Hornberger Aff., ¶7). The majority of the examiners in Plaintiff's unit had difficulty keeping up with their caseloads. However, Ward singled Plaintiff out and referred to him as "slow" and as "always needing help from others." (*Id.*). Ward issued Plaintiff a "Strategies for Success" action plan in December 2006. (Hornberger Depo., pp. 84-86; 102-103; Hornberger Aff., ¶7).

3

Case 3:10-cv-01053 Document 80 Filed 02/21/13 Page 3 of 10 PageID #: 1002

An oral warning was given to Plaintiff on May 11, 2007. (*Id.*, ¶8). According to Ward, even though he continued to receive considerable help, Plaintiff showed no sustained improvement and still had a high caseload. (Docket Entry No. 44-6, Ward Depo., p. 89). Plaintiff received an interim evaluation on July 10, 2007, and he was warned of the possibility of a suspension at that time. (Hornberger Depo., pp. 136-37, 143). Plaintiff received a rating of "Unacceptable" in his evaluation. (*Id.*, p. 143). His caseload was in the 190s whereas the agency average was in the 130s. (*Id.*, pp. 144-45). Plaintiff's performance still did not improve, and this resulted in a written warning on July 18, 2007. (*Id.*, p. 149). Plaintiff received the written warning because he still had a high caseload and was behind on his unassociated materials. (*Id.*, pp. 150, 306-07). Plaintiff's performance did not improve after the written warning even though he still continued to receive help. (*Id.*, pp. 161-62, 167-168, 170-72).

In September 2007, Plaintiff's father was admitted to Richland Place Nursing Home in Nashville, Tennessee. (Hornberger Aff., ¶11). Plaintiff's father's health was deteriorating rapidly suffering from heart problems and dementia, so Plaintiff approached Ward about applying for time off under The Family and Medical Leave Act of 1993, 29 U.S.C. §2601, *et. seq.*, ("FMLA"), to attend to his father. (*Id.*). The leave was approved for one year, and Plaintiff decided to take only one-day a week off so that he could take care of his father and keep up with his caseload. (*Id.*). Ward advised Plaintiff he would be judged on the work he did while in the office.[2] (Hornberger Depo., pp. 237-238; Ward Depo., p. 101). However, Ward continued to add cases to Plaintiff's workload despite the fact that he was on approved FMLA. (Hornberger

---

[2] There was no policy in place in DDS to address whether or not an individual on FMLA should be assigned new cases so they follow their general business practice. *See* (Docket Entry No. 44-11, Smith Depo. pp. 18-19; Eddie Depo. pp. 17-18).

4

Aff., ¶11). Plaintiff took FMLA from January to the second week of February when he was forced to cease FMLA because his caseload had increased dramatically. (*Id.*).

Shortly after Plaintiff returned to full-time work in February 2008, he was faced with a suspension for caseload management and unpaid travel vouchers. (Hornberger Aff., ¶12). Ward had entered Plaintiff's office while he was not present and discovered a few unpaid travel vouchers that amounted to approximately $300.00. (*Id.*). Plaintiff in his entire career with DDS was not aware of any individual ever being suspended for unpaid travel vouchers. (*Id.*).[3] According to Plaintiff, he then decided to not take any more of his approved FMLA or leave of any kind and concentrate on trying to save his job. (*Id.*, ¶13).

Plaintiff's performance never improved, and Ward began the process of terminating him. In July 2009, Ward formally drafted a recommendation to terminate to process Plaintiff's termination for "his inefficiency in the performance of job duties."[4] (Docket Entry No. 52-3, Memo from Ward to Lodge; Hornberger Aff., ¶15). Plaintiff faced with the possibility of losing his benefits after 30 years of service, retired. Plaintiff would not have retired had he not been faced with the high probability of termination. (Hornberger Aff., ¶16).

Additionally, in July 2009, Howell met with Plaintiff and asked him to sign a "Do Not Hire" notice that would have denied Plaintiff the right to apply for any job within the Tennessee Department of Human Services. (Hornberger Aff., ¶15). This had the operational effect of

---

[3] Conversely, according to Ward, Plaintiff had previously been warned about the possibility for a disciplinary action for travel vouchers in January, 2007, after she spent 8 hours handling Plaintiff's unassociated materials. (Ward Depo., pp. 159-60). TDHS issued a Notice to Plaintiff of its intent to suspend him on April 2, 2008. (Hornberger Depo., pp. 281, 305). TDHS intended to suspend Plaintiff because of both his poor caseload management and for having unpaid travel vouchers in February, 2008. (*Id.*, p. 303)

[4] TDHS was required to provide a recommendation as to whether an employee who is leaving, retiring, or terminated is eligible for rehire within the Department, within another position with the State, or not at all. (Howell Depo., p. 60). TDHS recommended that Plaintiff be ineligible for rehire within the Department based on his inability to handle his caseload. (*Id.*, pp. 60, 83-84; Hornberger Depo., pp. 89-90).

denying Plaintiff employment in any department within the State of Tennessee. (*Id.*). Plaintiff refused to sign the "Do Not Hire" notice. (*Id.*).

## II. ANALYSIS

Plaintiff asserts Defendants have retaliated against him in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA") for taking leave to care for his sick father.[5] Defendants have moved for summary judgment on this single claim.

### I. Summary Judgment Standard

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue

---

[5] Plaintiff also brought a claim of discrimination in accordance with the Age Discrimination in Employment Act of 1967 ("ADEA"). The Court dismissed this claim by Order entered on March 21, 2010. (Docket Entry Nos. 17-18).

6

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Family Medical Leave Act Retaliation Claim

Plaintiff asserts a retaliation claim under the FMLA.[6] (Docket Entry No. 49 at 1). Defendant claims that it had a legitimate, non-discriminatory reason for terminating Plaintiff unrelated to his FMLA leave. (Docket Entry No. 41 at 13).

The FMLA provides eligible employees with up to "12 workweeks of leave during any 12-month period" for various reasons, including "to care for ... a ... parent, of the employee ... if such ... parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). An employee eligible for leave under the FMLA is one who has "been employed (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

The Act prohibits an employer from "interfer[ing] with, restrain[ing], or deny [ing] the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). Further, the FMLA provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). An employee who believes his rights under the

---

[6] Plaintiff makes reference to a FMLA interference claim for the first time in *Plaintiff's Brief and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment*. Neither Plaintiff's *Complaint* nor *Amended Complaint* provide a "short and plain statement showing [he] is entitled to relief" of a FMLA interference claim. *See* F.R.C.P. 8(a)(2). Accordingly, such claim will not be considered by the Court.

7

FMLA have been violated may file suit in federal court. 29 U.S.C. § 2617. An injured employee may receive damages and equitable relief for violation of 29 U.S.C. § 2615. 29 U.S.C. § 2617(a)(1).

The FMLA prohibits employers from taking adverse employment actions against employees based on the employee's exercise of FMLA leave. *Bryant v. Dollar General Corp.,* 538 F.3d 394, 401 (6th Cir. 2008). Absent direct evidence of unlawful conduct, FMLA retaliation claims are evaluated according to the burden-shifting framework used in Title VII discrimination claims. *Hunter v. Valley View Local Schools,* 579 F.3d 688, 692 (6th Cir. 2009); *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007).

To state a *prima facie* claim of retaliation under the FMLA, a plaintiff must show that: (1) the plaintiff was engaged in an activity protected by the FMLA; (2) the defendant knew that the plaintiff was exercising the plaintiff's rights under the FMLA; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu Automotive Tennessee, Inc.,* 454 F.3d 549, 556 (6th Cir. 206).

The Sixth Circuit has held that "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007). Employers may not "use the taking of FMLA leave as a negative factor in employment actions." *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 707 (6th Cir. 2008) (citation omitted).

8
Case 3:10-cv-01053 Document 80 Filed 02/21/13 Page 8 of 10 PageID #: 1007

Plaintiff contends that he was retaliated against in numerous ways, which transpired as a result of his FMLA leave.[7] The alleged retaliatory acts are (1) the meeting on February 29, 2008, wherein he was "threatened" with suspension for his unpaid travel vouchers; (2) Defendant's April 2, 2008, intent to suspend him; (3) Defendant's intent to terminate him in 2009; and (4) Defendant's decision to code him for no rehiring within the Department. *See* (Docket Entry No. 49 at 12-15).[8] Defendants counter that in each instance the action taken was due to Plaintiff's poor work performance – and his poor work performance was well documented and existed long before Plaintiff ever took any FMLA leave. (Docket Entry No. 41 at 13-14).

Even if Plaintiff could establish a *prima facie* case, his claim fails because Defendant offers a legitimate, non-discriminatory reason for its conduct. Although Plaintiff attempts to dispute this notion, he concedes that (1) he was aware of the importance of processing travel vouchers, (2) he had previously been disciplined for failing to process travel vouchers, (3) he had unpaid travel vouchers in February, 2008, (4) he received numerous warnings for his high case load prior to his FMLA leave, (5) his caseload was above average before he started taking FMLA leave, and (6) his performance never improved upon his return. (Hornberger Depo., pp. 243, 281-282, 304, 306-307; Docket Entry No. 52-3, Memo from Ward to Lodge). As a result, Plaintiff was given numerous warnings, suspended, and ultimately recommended for termination.

---

[7] Plaintiff claims he was "targeted" as early as 2007 for termination – and Defendant used his FMLA as "a means to retaliate against [him] by increasing his caseload in order to build a stronger case for termination." (Docket Entry No. 49 at 11).

[8] For purposes of the summary judgment motion, Defendant concedes that the first two instances occurred within two months of the FMLA leave and is sufficient to create the inference of a causal connection. (Docket Entry No. 41 at 10).

9

In light of this proffered non-discriminatory reasons for Defendant's conduct, Plaintiff must show that the reason given was really a pretext for retaliation. Plaintiff has not presented evidence of pretext sufficient to create a genuine issue of material fact. As such, Plaintiff's FLMA retaliation claim cannot survive a motion for summary judgment.

### III. <u>CONCLUSION</u>

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 40) will be granted and this case will be dismissed with prejudice.

An appropriate Order shall be entered.

*[signature: Kevin H. Sharp]*

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE